UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

NICHOLAS FRANCHILLI,                                    Docket No. 7:23-cv-4940

                              Plaintiff,                **COMPLAINT**

                                                        [Demand for Jury Trial]

ALBERT EINSTEIN COLLEGE OF MEDICINE;
MONTEFIORE HEALTH SYSTEMS, INC.;
MONTEFIORE MEDICAL CENTER

                              Defendants
_____

        Plaintiff NICHOLAS FRANCHILLI, by and through his attorneys PACIFIC JUSTICE

INSTITUTE, upon knowledge unto himself and upon information and belief at to other matters

alleges as follows:

## NATURE OF THE ACTION

1.      Plaintiff Nicholas Franchilli (Hereinafter "Plaintiff" of "Mr. Franchilli") brings this

action against the Defendants Albert Einstein College of Medicine, Montefiore Medical Center

and Montefiore Health Systems (Hereinafter "Defendants"). This action is based on violations of

Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.*), New York City Human

Rights Law (NYCHRL) – Administrative Code of the City of New York §§ 8-101 *et seq.*, and the

New York State Human Rights Law – New York Executive Law, Article 15, § 296 – Unlawful

Discriminatory Practices.

2.      The basis of this complaint is that the Plaintiff requested a reasonable accommodation

against taking the COVID-19 vaccine, as such injection was against Plaintiff's sincerely held

religious beliefs.  During the COVID-19 pandemic, the Plaintiff, along with many other

employees, were allowed to work from home for over one year.  When Plaintiff was told by the employer that the employees would need to be vaccinated, the Plaintiff submitted a religious exemption application, requesting the accommodation that the employer continue allowing him to work from home.  The Defendants denied Plaintiff's exemption request.

3.      Defendants placed Plaintiff on unpaid leave on August 2, 2021 and terminated the Plaintiff on August 18, 2021.

4.      The adverse employment actions against the Plaintiff occurred because the Plaintiff could not and would not violate his religious belief.


## PARTIES

### Plaintiff

5.      Plaintiff Nicholas Franchilli is a 59-year-old male, currently residing at 1520 NW 18th Avenue, Apt. 203 in Delray Beach, Florida 33445.

6.      He formerly resided at 1002 Clarence Avenue, Bronx, New York 10465 and was residing at this address during his employment with Defendants.

7.      Plaintiff was employed at Albert Einstein College of Medicine, located at 1300 Morris Park Avenue, Belfer 1107, Bronx, New York 10461 from May 14th, 2018 to August 18th, 2021. Plaintiff was employed as a staff accountant in the Finance Department of the college.

### Defendants

8.      Defendant Albert Einstein College of Medicine is a private, nonprofit medical school located at 1300 Morris Park Avenue, Bronx, New York 10461. Upon information and belief, the school was founded in 1955 and is now part of the Montefiore Medicine Academic Health System.

9.      Defendant Albert Einstein College of Medicine is a school organized and operating under the laws of the State of New York.

10.     In 2015, Defendant Albert Einstein College of Medicine and Defendant Montefiore Health System finalized a deal, merging the college and the health system whereby the college is now operating under the auspices of the Montefiore Health System.  Upon information and belief, Montefiore manages the operations and is responsible for Defendant Albert Einstein College of Medicine.

11.     Defendant Montefiore Medical Center is the teaching hospital connected with Albert Einstein College of Medicine and is part of the Montefiore Health System.  Montefiore Medical Center is located at 111 East 210th Street, in Bronx, New York 10467.

12.     Defendant Montefiore Health System is a private, nonprofit corporation organized and existing under the laws of the State of New York. Montefiore operates multiple campuses across the state of New York, including New York City.

13.     Upon information and belief, Montefiore Health System has a principal place of business located at 555 South Broadway, Tarrytown, New York 10591.


## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the district courts have original jurisdiction over federal questions raised under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

15.     This Court has supplemental jurisdiction over Plaintiffs' related claims arising under New York State's Human Rights Law against discrimination pursuant to 28 U.S.C. § 1367(a).

16.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b), in that the Defendants' office and headquarters with whom the Plaintiff had dealings is in the Southern District and Defendants maintain significant operations within the Southern judicial district.

## PROCEDURAL REQUIREMENTS AND EXHAUSTION OF ADMINISTRATIVE REMEDIES

17.     The Plaintiff timely filed charges of discrimination with the United States Equal Employment Opportunity Commission ("the EEOC")  - Charge #520-2022-04968.

18.     On March 24, 2023, the EEOC issued a Notice of Right to Sue which was received by the Plaintiff on March 24, 2023.

19.     The Plaintiff has timely filed this instant action and complied with all administrative and procedural requirements necessary to file this lawsuit.

## STATEMENT OF FACTS

**Plaintiff's background and work history with Defendants**

20.     Plaintiff secured his Bachelor of Science – Accounting degree from City University of New York, Herbert H. Lehman College.

21.     Since 2005, Plaintiff has worked as an accountant for multiple companies including Robert Half Talent Solutions, Defendant Albert Einstein College of Medicine; and as a senior accountant for HairClub for Men, Mobius Management Systems, Inc., and Benchmark Education Company & Newark Learning, LLC.

22.     From 2007 to 2017, while working for Benchmark Education Company & Newark Learning, LLC, Plaintiff performed various tasks including, but not limited to preparing monthly financial management reports as well as actual vs. budget variance analysis and financial forecasts for review with department managers; preparing intercompany transactions between

subsidiaries; and supervising accounting staff – including staff accountants among other responsibilities.

23.     As an employee of the Defendants from May 14, 2018 to August 18, 2021, Plaintiff's responsibilities included, but were not limited to collaborating with the finance department and AP staff to execute international wires using CashPro online; coordinating with AP and Payroll for their respective ACH payment releases; acting liaison with CFO and internal law staff in preparing and submitting compliance reports and supporting documentation throughout the year for BUILDNYC and bondholders; performing monthly reviews, reconciliation and journalization of payroll intercharge billings between Defendants Albert Einstein and Montefiore Medical as well as reconciling general intercompany activity between both entities; among other tasks.

24.     Plaintiff was even responsible for organizing many files on the network.

25.     With all employees working remotely from March to June 2020, Plaintiff worked with another accountant to digitize all of the accounts payables and wire transfers into PDFs, organizing all files on Einstein's Internal Accounting Department network.

26.     By digitizing the files, all members of the accounting department had access to the files at all times, as no staff members were onsite to access paper files. The work was done more efficiently because of digital remote access.

**COVID-19 Pandemic and Subsequent Vaccination Mandate**

27.     With the onset of the COVID-19 pandemic, various companies implemented measures to make sure that their employees could continue working.

28.     Defendant Albert Einstein College of Medicine was no different. On or around March 20th, 2020, Defendant Albert Einstein College of Medicine closed their offices to the public and

employees.  At that time, all staff were permitted to work from home.  This initially lasted from March 23, 2020 to June 22, 2020.

29.    Upon information and belief, working remotely presented no problems for the employees. Plaintiff was never notified by his superiors that there was any problem with him working from home. Plaintiff remained productive, and deadlines for various assignments/tasks were met.

30.    At the office, Plaintiff was responsible for a multiplicity of tasks.  While working at home, those tasks did not change. The exact same tasks performed in the office were also performed at home.  In fact, while working at home, Plaintiff was able to manage the transition of support documents for all wire transfers from paper files to Portable Document Format (PDF) files.

31.    On or about June 22, 2020, Defendant Albert Einstein College of Medicine re-opened the offices for the staff to return on a rotating basis.  This meant that employees worked a hybrid schedule, with the staff performing half of their work tasks from home and the other half of their tasks at the office. The company gradually brought employees back into the office setting.

32.    Throughout the entire time that Plaintiff was working the hybrid schedule, not once was there any communication of any problems with missed deadlines and/or work not being done efficiently and effectively.

33.    The hybrid schedule lasted for one year (Mid-June 2020 thru Mid-July 2021), with the Plaintiff working from home.  As part of the hybrid process, several COVID procedural measures were implemented for those coming to the office, including frequent temperature checks and wearing of masks.

34.     On July 14, 2021, a notification was sent by United States Postal Service mail to all employees about Defendant Albert Einstein College of Medicine's COVID-19 vaccination policy. Plaintiff received his notice on or about Saturday, July 17, 2021.

35.     As part of the policy, Defendants required that the staff on the campus be vaccinated.  For the staff member seeking an exemption, if they met "the necessary requirements for an exemption," the Defendants were to "make every effort to accommodate them." **(See Exhibit A)**

36.     According to defendant's updated vaccine policy, if the Plaintiff was not vaccinated, Plaintiff had to "Complete PCR COVID-19 testing twice per week and present each result to Einstein's Occupational Health Services in order to be medically cleared to be on campus."  In addition, plaintiff had to "complete a daily electronic health assessment and display it upon entrance into campus buildings; display at all times a badge indicating that they have a vaccination exemption; and continue to wear a mask and socially distance at all times on campus," among other things. **(See Exhibit A)**

37.     Plaintiff was told that Defendants wanted an exemption request submitted to the Defendants by July 19, 2021; however, the main deadline was July 28, 2021. Naturally, Plaintiff was baffled by this as he was working from home and thus presented no health and safety threat to others.

38.     Plaintiff enjoyed working for the Defendants and had a great rapport with his then supervisor Mr. James Geraghty, Chief Financial Officer.  But at this point, his supervisor was limited in what he could do for Plaintiff.

**<u>Plaintiff's religious accommodation request and Defendants' denial</u>**

39.     The Plaintiff is a practicing Roman Catholic and has adhered to the principles of the Catholic Church for at least 25 years. A fundamental component of Plaintiff's sincerely held

religious beliefs is that all life is sacred, from the moment of conception to natural death, and that abortion is a grave sin against God and the murder of an innocent life.

40.     Plaintiff's sincerely held religious beliefs, rooted in scripture, precludes him from accepting any one of the three currently available COVID-19 vaccines, because all three vaccines were derived from, produced, manufactured by, tested on, developed with, or otherwise connected to aborted fetal cell lines.

41.     Plaintiff has sincerely held religious objections to the Johnson & Johnson (Janssen Pharmaceuticals) vaccine because it unquestionably used aborted fetal cells lines to produce and manufacture the vaccines.

42.     As reported by the North Dakota Department of Health, in its handout literature for those considering one of the COVID-19 vaccines, "[t]he non-replicating viral vector vaccine produced by Johnson & Johnson **did require the use of fetal cell cultures, specifically PER.C6, in order to produce and manufacture the vaccine**."[1]

43.     The Louisiana Department of Health likewise confirms that the Johnson & Johnson COVID-19 vaccine, which used PER.C6 fetal cell line, "is a retinal cell line that was **isolated from a terminated fetus in 1985**." Louisiana Department of Public Health, *You Have Questions, We Have Answers: COVID-19 Vaccine FAQ* (Dec. 12, 2020), *available at* https://ldh.la.gov/assets/oph/Center-PHCH/Center-PH/immunizations/You_Have_Qs_COVID-19_Vaccine_FAQ.pdf

44.     Scientists at the American Association for the Advancement of Science have likewise published research showing that the Johnson & Johnson vaccine used aborted fetal cell lines in the

---

[1] *See* North Dakota Health, *COVID-19 Vaccines & Fetal Cell Lines* (Apr. 20, 2021), *available at* https://www.health.nd.gov/sites/www/files/documents/COVID%20Vaccine%20Page/COVID-19_Vaccine_Fetal_Cell_Handout.pdf

development and production phases of the vaccine. *Meredith Wadman*, *Vaccines that use human fetal cells draw fire*, Science (June 12, 2020), *available at* https://science.sciencemag.org/content/368/6496/1170.full

45.     Plaintiff also has sincerely held religious objections to the Moderna and Pfizer/BioNTech COVID-19 vaccines because both of these vaccines, too, have their origins in research on aborted fetal cells lines.

46.     As reported by the North Dakota Department of Health, in its handout literature for those considering one of the COVID-19 vaccines, the Moderna and Pfizer mRNA vaccines are ultimately derived from research and testing on aborted fetal cell lines. In fact, "[e]arly in the development of mRNA vaccine technology, **fetal cells were used for 'proof of concept' (to demonstrate how a cell could take up mRNA and produce the SARS-CoV-2 spike protein) or to characterize the SARS-CoV-2 spike protein**."[2]

47.     The Louisiana Department of Health's publications again confirm that aborted fetal cells lines were used in the "proof of concept" phase of the development of their COVID-19 mRNA vaccines. Louisiana Department of Public Health, *You Have Questions, We Have Answers: COVID-19 Vaccine FAQ* (Dec. 12, 2020), *available at* https://ldh.la.gov/assets/oph/Center-PHCH/Center-PH/immunizations/You_Have_Qs_COVID-19_Vaccine_FAQ.pdf.

48.     Because all three of the currently available COVID-19 vaccines are developed and produced from, tested with, researched on, or otherwise connected with the aborted fetal cell lines HEK-293 and PER.C6, Plaintiff's sincerely held religious beliefs compel him to abstain from

---

[2] *See* North Dakota Health, *COVID-19 Vaccines & Fetal Cell Lines* (Apr. 20, 2021), *available at* https://www.health.nd.gov/sites/www/files/documents/COVID%20Vaccine%20Page/COVID-19_Vaccine_Fetal_Cell_Handout.pdf

obtaining or injecting any of these products into his body, regardless of the perceived benefit or rationale.

49.      Additionally, the Plaintiff believes that because the church teaches that we are made in the image of God and have free will to choose, Plaintiff should have been allowed to decide for himself whether to take the COVID-19 vaccine.

50.      On July 19, 2021, Plaintiff submitted his religious exemption request by email to Mr. Robert L. Cancellieri, Esq., Director of Employees Relations for the Defendant Albert Einstein College of Medicine.  In his request, Plaintiff attached a personal statement explaining his objections to taking the COVID-19 vaccine. **(See Exhibit B)**

*51.*      Specifically, Plaintiff stated that *"All vaccines have been scientifically shown to contain aborted fetal tissues, which is in direct opposition to the teaching of the Catholic Church. As a faithful and practicing Catholic, I am opposed to all vaccines."*  Plaintiff continued by stating *"I am opposed to being part of an experiment that has the potential to do me harm, as well as contradicts my religious beliefs."*

52.      On July 30, 2021, Plaintiff received an email from Mr. Cancellieri stating that his religious exemption request had been denied.  **(See Exhibit C).**

53.      Plaintiff spoke with the Defendants about accommodations that could be made, including the ability to remain at home to perform his tasks.  After all, he had been working from home for a year, maintained his workload, met all deadlines, and remained productive enough for the company to never question his work performance.

54.      In coming back to the office, Plaintiff could have continued the hybrid schedule, working part-time from home and part-time at the office.  Plaintiff was willing to wear masks and even come to the office when no one was present.

55.     Yet, Defendants insisted that Plaintiff could either be vaccinated or be terminated.

56.     Though the July 30th notice stated that Plaintiff had five days to appeal, the letter also stated that he had to have his first vaccine injection by August 2, 2021 – which provided little to no time for him to appeal. No further negotiations took place afterwards. No other meaningful cooperative dialogue occurred. **(See Exhibit C)**

57.     Plaintiff acknowledges that he was provided with the alternative of testing for COVID-19 twice per week; however, such testing would have had to have been done on the Plaintiff's own time, with the Plaintiff's own money, and limited to nasopharyngeal testing which the Plaintiff believed was too dangerous.[3]

58.     Plaintiff also notes that pursuant to the Catholic beliefs, an individual cannot engage in activities, or consent to have medicinal treatment or testing related items with chemicals that can harm the body. That includes the use of nasopharyngeal testing swabs with chemical additives which  would be inserted for COVID-19 testing purposes.[4]

59.     In addition, rapid testing was not allowed by the employer and the only choice was nasopharyngeal testing which would return results in 24-48 hours.  Thus, this was not an option for the Plaintiff.

60.     Plaintiff would not have been able to enter the office building without receiving a negative test result.  Plaintiff would have had to swallow all expenses incurred for each test  -

---

[3] For more information on the adverse effects of nasopharyngeal testing, see the following articles: (a) Föh B, Borsche M, Balck A, *et al*. Complications of nasal and pharyngeal swabs – a relevant challenge of the COVID-19 pandemic?. *Eur Respir J* 2020; in press (https://doi.org/10.1183/13993003.04004-2020); (b) Gupta K, Bellino PM, and Charness ME. (2020). Adverse effects of nasopharyngeal swabs: Three-dimensional printed versus commercial swabs. Infection Control & Hospital Epidemiology, https://doi.org/10.1017/ice.2020.297

[4] See Catholic Catechism paragraphs #1782 - which speaks man having the right to act in conscience and in freedom regarding moral decisions and must not be forced to act contrary to his conscience; and #2295 – which states in part that "research or experimentation on the human being cannot legitimate acts that are in themselves contrary to the dignity of persons and to the moral law…" for more information, go to https://www.catholiccrossreference.online/catechism/#!/search/1776-1782 and https://www.catholiccrossreference.online/catechism/#!/search/2295

losing work time (at least 1 to 2 days worth) waiting on test results each week; and if any infection was detected, Plaintiff would have lost work time as well.

61.     Each week, Plaintiff would have had to endure this testing requirement.  This is not a reasonable accommodation.  Allowing Plaintiff to remain at home to work would have alleviated the health and safety concerns of the Defendants.

62.     On August 3, 2021, Plaintiff was directed by Mr. Geraghty to take a vacation until the Defendants formally notified him of his employment status.

**Plaintiff's employment termination and aftermath**

63.     Plaintiff was placed on unpaid leave on August 2, 2021. He was then given two weeks' severance pay, paid all of his accrued vacation time (which amounted to 4 weeks' pay), and terminated on August 18, 2021.

64.     According to the termination letter by the Defendants, dated August 18, 2021 and written by Ms. Yvonne Ramirez, Vice President of Human Resources and Title IX Coordinator, Defendants acknowledged reviewing the email correspondence Plaintiff addressed to Mr. James Geraghty, Mr. Robert Cancellieri, Mr. Michal Sica and Ms. Ramirez about Plaintiff's inability to take the COVID-19 vaccine.

65.     The August 18th letter from Defendants stated that following: *"I have reviewed your email, dated August 13, 2021, addressed to James Geraghty, Robert Cancellieri, Michael Sica, and me, notifying us that you are unable to comply with Einstein's vaccination requirements or alternative compliance terms.  We will not modify the requirements we have implemented to protect the students and employees of the College.  As such, we must inform you that your employment with Albert Einstein College of Medicine is terminated, effective today…"* **(See Exhibit D)**

66.     Up until the time Plaintiff was told to go on vacation on August 3rd, 2021, Plaintiff was working from home. Plaintiff was still efficient and productive for the Defendants as an accountant from his home.

### Difficulty in finding replacement employment

67.     As a result of losing his job, Plaintiff has endured severe hardship.  First, Plaintiff had to leave his home and New York State, where he resided his entire life.  Finding replacement employment was difficult in New York State as many companies expected new hires to be vaccinated.

68.     Because Plaintiff could not find replacement employment in New York, his finances began to run dry.  He filed for unemployment on September 15, 2021, but was denied. The bills continued to accumulate.

### Forced Sale of New York Home

69.     Second, Plaintiff was paying a mortgage on his home, located at 1002 Clarence Avenue, Bronx, New York 10465 which at the time was $2,633.57 per month.  Due to the loss of his employment, the mortgage payments were becoming too much to bear.

70.     In addition, Plaintiff was having difficulty securing replacement work in New York State as most companies wanted new hires to have already received the vaccine.

71.     In order to avoid having his home go into foreclosure, Plaintiff was forced to place his New York home for sale starting on August 20, 2021.

### Relocation outside of New York State

72.     Third, employment in New York State was difficult to obtain due to the strict vaccine mandates in the state. Many New York employers wanted new hires to be vaccinated prior to starting a new position.  Naturally, this posed a problem for the Plaintiff.

73.    Plaintiff started looking for work in Florida on or around mid-September 2021.  Plaintiff

had already endured tremendous stress and anxiety, but he needed a respite to discuss moving

decisions with his family before immediately looking for another position.  Since Florida based

employers were not requiring employees to be vaccinated for on-site positions, Plaintiff spent

time looking for employment in Florida from Mid-September 2021 to Mid-January 2022.

74.    On January 21, 2022, Plaintiff was able to secure some temporary work with Robert Half

International ("Robert Half") as an Accounting Consultant.  The position, however, was in the

state of Florida.

### Separation from Wife and Son/More relocation expenses

75.    Fourth, Plaintiff started working remotely for Robert Half until February 28, 2022.

Afterwards, Plaintiff had to work at the site in South Florida.  He resided in a hotel for two weeks

until he could sign a lease for a new apartment, which is where he currently resides.

76.    This added another level of stress to the Plaintiff as he had to be separated from his wife

Vincine Franchilli ("Mrs. Franchilli") and son for five weeks in order to continue working for

Robert Half in Florida office.

77.    Due to his anxiety, in September 2021, Plaintiff sought therapy from a therapist as well

as his pastor. With the stress of losing his job, having to sell his New York home, and being away

from his wife and son, Plaintiff's counseling sessions brought a sense of calm to a turbulent

situation.

78.    While Plaintiff was in Florida, Mrs. Franchilli and their son remained in New York as

their house had not yet been sold.

79.    Upon information and belief, Mrs. Franchilli endured untold stress due to her husband's

lost employment and need to relocate away from the family. There were times when she sought

medical attention to deal with the aftermath of the family having to relocate away from New York, the sale of their New York home, and fare wells to family and friends.

80.     After seeking medical treatment in September and October 2021, Mrs. Franchilli was diagnosed with anxiety from one physician and high blood pressure with heart palpitations from another medical provider.

81.     Plaintiff did not close on his Bronx, New York home until March 22, 2022.  Mrs. Franchilli had to remain in New York until the house was sold.  This added to the stress of both Plaintiff and his wife.

82.     After the sale of the home, Mrs. Franchilli and Plaintiff's son were able to join him in Florida.

83.     This was on top of the additional stress of having to find a new permanent home in Florida – which includes (a) the stress of contemplating one's available savings and investments to obtain finances for the relocation; (b) obtaining the new residence; (c) having to pack; (d) obtaining a moving company; (e) driving down to Florida; and (f) getting situated into a new state, a new community, and a new way of life in general, among other things – all as a result of Plaintiff's termination from his employment with the Defendants.

**Separation from Church Family/Community**

84.     Fifth, in addition to being forced to sell his New York home, Plaintiff was forced to leave his parish community at St. Theresa Church.  Both Plaintiff and his wife were active parishioners at the church. Both volunteered for the annual street festival every summer, participating in a variety of activities since 1997. They also volunteered with Casino night and other fundraisers for over twenty years.

85.     For five years, both Plaintiff and his wife sang in the weekly choir for 12:15 Sunday Mass.

86.     Plaintiff and his wife served on the Capital Improvement Committee whenever the parish underwent a capital improvement for upgrading and improving the church, school and rectory buildings or replacing A/C, and heating units.

87.     Mrs. Franchilli volunteered for Class Mom and chaperoned for school trips while their son attended St. Theresa School from kindergarten to eighth grade.

88.     St. Theresa's Catholic church was an integral part of Plaintiff's life, yet all of that ended upon Plaintiff's employment termination from the Defendants and subsequent difficulty in securing replacement work in the state of New York.

**Other Employment Positions**

89.     Before settling into the current position, Plaintiff sought work with several entities in order to continue providing for his family. Plaintiff started working for Robert Half Legal in January 2022 and was placed on a 90-day probationary period.  By March 24, 2022, it was determined that Plaintiff was not the right fit for the role he was hired to do. Thus, he continued his job search.

90.     In early July 2022, Plaintiff accepted part-time work for a local synagogue, Young Israel, doing light book-keeping and payroll for the staff.  This was a part-time temporary job where Plaintiff worked 20 hours per week.  Yet, Plaintiff continued his employment search as full-time work was needed to help support his family.

91.     A month later, Plaintiff secured a full-time position at Hair Club International as a Senior Accountant.  There was also a 90-day probationary period in place here.  Shortly after starting this position, Plaintiff was asked to work 60-70 hours per week due in part to staffing shortages in the

accounting department.  This placed too much pressure on the Plaintiff as he was still trying to readjust to a new environment while trying to manage his family responsibilities at the same time. The position lasted only a few months; however, Plaintiff continued diligently searching for work.

92.     On January 19, 2023, Plaintiff secured employment as a Senior Accountant for his current employer, Willis Aeronautical Services, Inc..

**Conflict of Interest**

93.     It should also be noted that Defendants have an apparent conflict of interest related to promoting the COVID-19 vaccines.  Defendants have received grants in excess of $200 million from the National Institutes of Health (NIH).

94.     Specifically, in early 2022, Defendants received a five-year, $3.4 million dollar grant from NIH to "test a program aimed at reducing SARS-CoV-2 transmission amongst people recently released from incarceration."[5]

95.     Per a news release in June 2022, Defendants were also awarded a five-year, $3.5 million dollar grant from NIH to examine the effects of COVID-19 on the brains of adults who had mild or asymptomatic infection.[6]

96.     In 2001, Defendants were recipients of a grant awarded by the CDC to help improve the health of inner-city children with Asthma.

97.     As a recipient of various grants from both NIH and the CDC, both of which promoted the COVID-19 vaccines as being safe and effective, Defendants had a conflict of interest between

---

[5] For more information, see the article "NIH Grant Tests Strategies to Limit COVID-19 Spread Among Formerly Incarcerated People" -  https://www.einsteinmed.edu/news/2726/nih-grant-tests-strategies-to-limit-covid-19-spread-among-formerly-incarcerated-people/
[6] For more information, see the article "Einstein Researchers Awarded $3.5 Million NIH Grant to Study Brain Changes Causes by COVID-19" -  https://www.einsteinmed.edu/news/4795/einstein-researchers-awarded-$35-million-nih-grant-to-study-brain-changes-caused-by-covid-19/

promoting the COVID-19 vaccine and accepting religious accommodations from Defendants' employees against taking the vaccine.

## FIRST CAUSE OF ACTION

**Violation of Title VII of the Civil Rights Act of 1964 [42 U.S.C. § 2000e *et seq.*]**
**Unpaid Leave and Termination on the Basis of Religion**

98.     Plaintiff hereby realleges and incorporates by reference the preceding paragraphs, as though fully set forth herein.

*99.*     Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq* includes the following definitions:

> *(b) The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person...;*
>
> *...*
>
> *(f) The term "employee" means an individual employed by an employer...*
>
> *...*
>
> *(j) The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.*

100.     Pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1):

> *It shall be an unlawful employment practice for an employer*

> *(1) to fail or refuse to hire or to discharge any individual, or otherwise to*
>
> *discriminate against any individual with respect to his compensation,*
>
> *terms, conditions or privileges of employment, because of such*
>
> *individual's race, color, religion, sex, or national origin; or*
>
> *(2) to limit, segregate, or classify his employees or applicants for*
>
> *employment in any way which would deprive or tend to deprive any*
>
> *individual of employment opportunities or otherwise adversely affect his*
>
> *status as an employee, because of such individual's race, color, religion,*
>
> *sex, or national origin.*

101.    The Defendants Albert Einstein College of Medicine and Montefiore, upon information and belief, qualifies as a covered employer subject to 42 U.S.C. § 2000e *et seq*.

102.    The Plaintiff was at all times relevant herein an employee covered by 42 U.S.C. § 2000e *et seq*., which prohibits discrimination in employment on the basis of religion.

103.    The Plaintiff is a practicing Catholic and has been in the faith for at least 25 years.  He is unreservedly against taking a vaccination connected in any way with aborted fetal tissue. As part of his belief, the Catholic faith prohibits abortions believing that all life is precious in the site of the Almighty God.

104.    Upon learning that the Defendants would require all employees to be vaccinated, Plaintiff submitted a religious exemption request, explaining that pursuant to his faith, he could not in good conscience take the COVID-19 vaccine.

105.    To establish a prima facie case under Title VII, the employee must show that "(1) they held a bona fide religious belief which conflicts with an employment requirement; (2) they informed their employer of this belief; and (3) they were disciplined for failure to comply with the

conflicting employment requirement. *Knight v. Connecticut Department of Public Health*, 275 F. 3d 156, 167 (2d. Cir. 2001); *Baker v. Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006)

106.    On July 19, 2021, Plaintiff submitted his religious exemption request to Defendants, specifically Robert Cancellieri, Esq., Director of Employees Relations for Defendant Albert Einstein College of Medicine.  Within Plaintiff's request, he specifically stated that as a practicing Catholic, he is opposed to all vaccines, including those that use aborted fetal tissue – which in this matter refers to the COVID-19 vaccine.

107.    On July 30, 2021, Plaintiff was notified by email from the Defendants that his religious exemption request had been denied.  Plaintiff received a notice on July 30, 2021 that he had five days to appeal the decision – yet had to receive his first COVID-19 vaccine injection by August 2, 2021.

108.    Plaintiff was placed on unpaid leave by Defendants on August 2, 2021 and on August 3, 2021, Plaintiff was directed by Defendants (specifically his supervisor Mr. Geraghty) to take a vacation until Defendants formally notified Plaintiff of his employment status.

109.    Two weeks later, Plaintiff was terminated.  In a letter dated August 18, 2021, Defendants noted that because Plaintiff was unable to comply with Einstein's vaccination requirements or alternative compliance terms,  his employment would be terminated immediately.

110.    "The Court of Appeals has provided that adverse employment actions under Title VII's substantive anti-discrimination provisions are generally characterized as 'materially adverse changes in the terms and conditions of employment,' including 'termination of employment.'" *Bowles v. New York City Transit Authority*, 285 Fed. Appx. 812, 814 (2d Cir. 2008) (quoting *Zelnik v. Fashion Institute of Technology*, 464 F.3d 217, 225 (2d Cir. 2006) as cited in *Corrales*, 2023 U.S. Dist. LEXIS 55620 at *15.

111.    Plaintiff's employment termination was effective August 18, 2021.

112.    As a result of termination, Plaintiff experienced difficulty in finding replacement employment as most New York employers required Plaintiff to be vaccinated.  Even with the various subsequent employment positions found, the actual work, compensation and environment was in many respects below the level of his previous employment with the Defendants.

113.    Plaintiff was forced to sell his New York Home because without a regular paycheck, he could not maintain the mortgage.

114.    Plaintiff was forced to relocate outside of New York State to find replacement employment – which would allow him to work unvaccinated. Plaintiff incurred thousands in expenses connected with the relocation outside of New York State.

115.    Plaintiff had to be separated from his wife and son while relocating outside of the State of New York to find replacement employment.

116.    Plaintiff endured permanent separation from his church community that both he and his wife were heavily involved in.

117.    Based on all of the above, Plaintiff seeks damages in recovery due to his employment termination on the basis of his religion.

## SECOND CAUSE OF ACTION

**Violation of Title VII of the Civil Rights Act of 1964 [42 U.S.C. § 2000e *et seq*.]
Failure to provide reasonable accommodations/
Failure to engage in meaningful cooperative dialogue**

118.    Plaintiff hereby realleges and incorporates by reference the preceding paragraphs, as though fully set forth herein.

119.    According to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, it is an unlawful employment practice to fail or refuse to reasonably accommodate the religious beliefs and practices of an employee or prospective employee.

120.    In analyzing a Title VII failure to accommodate religious discrimination claim, the second circuit identifies a two-step inquiry.  The courts must determine "whether an employee established a prima facie case for failure to accommodate the employee's religion." *Baker*, 445 F.3d at 546; *Knight,* 275 F.3d at167. "If the employee has made the prima facie case and the employer has not reasonably accommodated the employee, 'the burden then shifts to the employer to show it could not accommodate the employee's religious beliefs without undue hardship.'" *Knight*, 275 F.3d at 167; *Baker*, 445 F. 3d at 546 as cited in *Corrales v. Montefiore Medical Center*, 2023 U.S. Dist. LEXIS 55620 *13 (S.D.N.Y. 2023).

121.    During the COVID-19 Pandemic, many companies around New York City closed their offices.  Defendants closed their offices on or around March 20, 2020.  Plaintiff and other staff were permitted to work from home.

122.    Plaintiff remained productive, with deadlines for assigned tasks met.  Plaintiff had the same work responsibilities at the home as he did at the office and was able to perform the same tasks at home as he was at the office.

123.    On or about June 22, 2020, the company staff worked a hybrid schedule. The Defendants re-opened the offices for the staff to return on a rotating basis, which Plaintiff was a part of.  The hybrid schedule lasted for one year, with Plaintiff working from home.

124.    When Plaintiff came into the office, he was required to have his temperature checked and to wear a mask, which he gladly did.

125.    On July 14, 2021 Defendants sent a notification to staff requiring them to obtain the COVID-19 vaccine.  Plaintiff submitted an exemption and requested that he remain at home as a reasonable accommodation.

126.    Plaintiff had been working from home for over one year, had been productive, was more efficient with the documents and network, and kept up with all deadlines.

127.    Plaintiff performed the same tasks at home as he did from his office.  By working from home, Plaintiff presented no health or safety threat to others.

128.    The Northern District Court noted in *Connors v. Certified Mktg.,* 2005 U.S. Dist. LEXIS 16777, 2005 WL 8169553 at *9-10, *19-20 (N.D.N.Y. 2005) that working from home qualified as a reasonable accommodation as the plaintiff in the case was able to perform the essential functions of the job from home.

129.    Defendants presented an option of nasopharyngeal testing twice per week; however, Plaintiff would have had to have the testing done on Plaintiff's own time, using Plaintiff's own money. Plaintiff would not have been permitted back to the work site until he returned with a negative test.

130.    Testing would have been a necessity week after week, costing Plaintiff money that he did not have due to lost work.  This was not a reasonable accommodation.

131.    Plaintiff also expressed concerns about the chemical impact on his body and infringement upon his faith with nasopharyngeal testing.  Testing would not have been necessary if Plaintiff was allowed to continue his work from home.  He would not have posed a health or safety issue to Defendants.

132.    After Plaintiff received the July 30th notice, there was no additional meaningful cooperative dialogue between Plaintiff and Defendants.  No further negotiations took place.

133.    Simply put, Plaintiff was told to take a vacation and two weeks later on August 18, 2021, he was terminated.

134.    As a result of the termination, Plaintiff had to seek employment outside of New York state; sell his home; leave his family for a few months; leave his church; and endure untold stress while trying to acclimate himself to a new working and living environment.

135.    Plaintiff seeks damages in recovery for Defendants' failure to allow for reasonable accommodations and failure to engage in meaningful cooperative dialogue with Plaintiff.


### THIRD CAUSE OF ACTION

**Violation of New York Executive Law, Article 15 § 296**
**Unlawful discriminatory practices**

136.    Plaintiff hereby realleges and incorporates by reference the preceding paragraphs, as though fully set forth herein.

137.    According to the New York Human Rights Law [New York Executive Law, Article 15 § 296 (10)(a)], *"It shall be an unlawful discriminatory practice for any employer, or an employee or agent thereof, to impose upon a person as a condition of obtaining or retaining employment, including opportunities for promotion, advancement or transfers, or any terms or conditions that would require such person to violate or forego a sincerely held practice of his or her religion, including but not limited to the observance of any particular day or days or any portion thereof as a sabbath or other holy day in accordance with the requirements of his or her religion or the wearing of any attire, clothing, or facial hair in accordance with the requirements of his or her religion, unless, after engaging in a bona fide effort, the employer demonstrates that it is unable to reasonably accommodate the employee's or prospective employee's sincerely held religious observance or practice without undue hardship on the conduct of the employer's business…"*

138.    Plaintiff is a practicing Catholic and has been for over two decades.  He is against taking a vaccination connected in any way with aborted fetal tissue. As part of his belief, the Catholic faith prohibits abortions believing that all life is precious in the site of the Almighty God.

139.    Upon learning that the Defendants would require all employees to be vaccinated, Plaintiff submitted a religious exemption request, explaining that pursuant to his faith, he could not in good conscience take the COVID-19 vaccine.

140.    On July 19, 2021, Plaintiff submitted his religious exemption request to Defendants and within Plaintiff's request, he specifically stated that as a practicing Catholic, he is opposed to all vaccines, including those that use aborted fetal tissue – which in this matter refers to the COVID-19 vaccine.

141.    On July 30, 2021, Plaintiff was notified by email from the Defendants that his religious exemption request had been denied.  Plaintiff received a notice on July 30, 2021 that he had five days to appeal the decision – yet had to receive his first COVID-19 vaccine injection by August 2, 2021.

142.    Plaintiff was placed on unpaid leave by Defendants on August 2, 2021 and on August 3, 2021, Plaintiff was directed by Defendants (specifically his supervisor Mr. Geraghty) to take a vacation until Defendants formally notified Plaintiff of his employment status.

143.    Two weeks later, Plaintiff was terminated.  In a letter dated August 18, 2021, Defendants noted that because Plaintiff was unable to comply with Einstein's vaccination requirements or alternative compliance terms,  his employment would be terminated immediately.

144.    At the beginning of the pandemic, Defendants closed their offices on or around March 20, 2020.  Plaintiff and other staff were permitted to work from home.

145.    On or about June 22, 2020, the company staff worked a hybrid schedule. The Defendants re-opened the offices for the staff to return on a rotating basis, which Plaintiff was a part of.  The hybrid schedule lasted for one year, with Plaintiff working from home.

146.    Plaintiff had been working from home for over one year; was productive, efficient, and kept up with all deadlines.

147.    Plaintiff performed the same tasks at home as he did from his office.  By working from home, Plaintiff presented no health or safety threat to others.  Thus, it would not have been an undue hardship on Defendants to allow Plaintiff to remain working from home.

148.    Plaintiff was terminated in August 2021, and as a result, had difficulty finding replacement work in New York.

149.    Plaintiff was forced to sell his New York home; relocate out of state  - away from his wife and son – all to secure employment and support his family.

150.    Plaintiff seeks damages against Defendants for engaging in unlaw discriminatory practices.

<u>**FOURTH CAUSE OF ACTION**</u>

**New York City Human Rights Law (NYCHRL) –
Administrative Code of the City of New York  §§ 8-101 *et seq***

151.    Plaintiff hereby realleges and incorporates by reference the preceding paragraphs, as though fully set forth herein.

152.    According to the New York City Administrative Code §8-107(3)(a), *"It shall be an unlawful discriminatory practice for an employer or an employee or agent thereof to impose upon a person as a condition of obtaining or retaining employment any terms or conditions, compliance with which would require such person to violate, or forego a practice of, such*

*person's creed or religion, including but not limited to the observance of any particular day or days or any portion thereof as a sabbath or holy day or the observance of any religious custom or usage, and the employer shall make reasonable accommodation to the religious needs of such person."* "'Reasonable accommodation,'" as used in this subdivision, shall mean such accommodation to an employee's or prospective employee's religious observance or practice as shall not cause undue hardship in the conduct of the employer's business." The city must show that accommodating the employee would cause a *"significant interference with the safe or efficient operation of the workplace."* See NYC Admin. Code §8-107(3)(b).

153.     *"The determination that no reasonable accommodation would enable the person requesting an accommodation to satisfy the essential requisites of a job or enjoy the right or rights in question may only be made after the parties have engaged, or the covered entity has attempted to engage, in a cooperative dialogue."* New York City Admin. Code §8-107(28)(e).

154.     At the beginning of the pandemic, Defendants closed their offices on or around March 20, 2020.  Plaintiff and other staff were permitted to work from home.

155.     On or about June 22, 2020, the company staff worked a hybrid schedule. The Defendants re-opened the offices for the staff to return on a rotating basis, which Plaintiff was a part of.  The hybrid schedule lasted for one year, with Plaintiff working from home.

156.     Plaintiff had been working from home from March 2020 to July 2021. Plaintiff was productive, efficient, and kept up with all deadlines.

157.     Plaintiff performed the same tasks at home as he did from his office.  By working from home, Plaintiff presented no health or safety threat to others.  Thus, it would not have been an undue hardship on Defendants to allow Plaintiff to remain working from home.

158.    Plaintiff is a practicing Catholic and has been for over two decades.  He is against taking a vaccination connected in any way with aborted fetal tissue. As part of his belief, the Catholic faith prohibits abortions believing that all life is precious in the site of the Almighty God.

159.    Plaintiff was notified that Defendants would require that all employees be vaccinated. Since this posed a problem for the Plaintiff due to his sincerely held religious beliefs, Plaintiff submitted a religious exemption request, explaining that pursuant to his faith, he could not in good conscience take the COVID-19 vaccine.

160.    Plaintiff specifically stated in his exemption request that as a practicing Catholic, he is opposed to all vaccines, including those that use aborted fetal tissue – which in this matter refers to the COVID-19 vaccine.

161.    Plaintiff sought the reasonable accommodation of remaining at home for work, as he had been doing for over one year starting in March 2020.

162.    On July 30, 2021, Plaintiff was notified by email from the Defendants that his religious exemption request had been denied.  Plaintiff received a notice on July 30, 2021 that he had five days to appeal the decision – yet had to receive his first COVID-19 vaccine injection by August 2, 2021.

163.    Plaintiff was placed on unpaid leave by Defendants on August 2, 2021 and on August 3, 2021, Plaintiff was directed by Defendants (specifically his supervisor Mr. Geraghty) to take a vacation until Defendants formally notified Plaintiff of his employment status.

164.    There was no meaningful cooperative dialogue between Plaintiff and Defendants about Plaintiff's accommodation request to remain at home to continue to perform his tasks.

165.    Allowing Plaintiff to remain at home would not have caused any significant interference with the safe and efficient operation of the workplace. Plaintiff also would not need to take time

off from work, spending his own money each week to be tested with nasopharyngeal testing because Plaintiff would have only been in his home setting – not in the office.

166.    Yet, two weeks after being placed on unpaid leave, Plaintiff was terminated.  In the August 18, 2021 letter, Defendants noted that because Plaintiff was unable to comply with Einstein's vaccination requirements or alternative compliance terms,  his employment would be terminated immediately.

167.    Plaintiff was terminated in August 2021, and as a result, had difficulty finding replacement work in New York.

168.    Plaintiff was forced to sell his New York home; relocate out of state  - away from his wife and son – all to secure employment and support his family.

169.    Plaintiff seeks damages in recovery for unlawful discriminatory practice pursuant to the New York City Administrative Code.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests this Court to grant the following relief:

1.  Declare that Defendants (a) violated Title VII of the Civil Rights Act of 1964 [42 U.S.C. § 2000e *et seq.*] by engaging in unlawful discrimination against Plaintiff, failing to provide reasonable accommodations, and failing to engage in meaningful cooperative dialogue with Plaintiff; (b) violated New York Executive Law, Article 15 § 296 [New York State Human Rights Law]; and violated New York City Human Rights Law, Administrative Code of the City of New York §§ 8-101 *et seq.*;

2.  Award Plaintiff compensatory damages including, but not limited to backpay, front pay, lost benefits, interest, pain and suffering, and emotional distress;

3.  Award Plaintiff all lost promotional pay, including salary increases, raises, bonuses, contributions to pensions; reimbursement for penalties incurred from early withdrawal of 401k and other sources necessary to live and support his family due to loss of income;

4.  Award Plaintiff punitive damages;

5.  Award Plaintiff nominal damages;

6.  Award Plaintiff all other allowable statutory damages;

7.  Award Plaintiff attorneys' fees and cost associated with this cause of action;

8.  Award any other relief as the Court deems just and proper.

Dated:          June 13, 2023
                White Plains, New York

                                   Respectfully Submitted,


                                   _____/S/_____
                                   Mishael M. Pine (**Bar #MP2676**)
                                   Staff Attorney
                                   PACIFIC JUSTICE INSTITUTE, INC.
                                   75 South Broadway, Suite 4-9272
                                   White Plains, New York 10601
                                   T: (347) 927-9343
                                   F: (917) 210-3737
                                   Email: mpine@pji.org
                                   *Counsel for Plaintiff*